Anna M. WALKER, Plaintiff,

v.

Elliot L. RICHARDSON, Secretary of Health, Education and Welfare, Defendant.

No. 18759-1.

United States District Court,
W. D. Missouri, W. D.

March 6, 1972.

Harvey L. McCormick, Kansas City, Mo., for plaintiff.

Anthony P. Nugent, Jr., Asst. U. S. Atty., Kansas City, Mo., for defendant.

## MEMORANDUM

JOHN W. OLIVER, District Judge.

Plaintiff seeks a review of a final decision of the Secretary of Health, Education, and Welfare, denying her application for widow's disability insurance benefits. Plaintiff's motion for summary judgment must be denied and the defendant's similar motion granted if there is substantial evidence to support the Secretary's decision. On the other hand, plaintiff's motion must be granted and the defendant's denied if the converse is true. We find and conclude that plaintiff's motion should and will be granted.

Decision of this case was delayed because plaintiff's counsel suggested that many of the legal questions presented were presented in Cohen v. Perales (5th Cir., 1969) 412 F.2d 44, rehearing denied 416 F.2d 1250, cert. granted *sub nom.* Finch v. Perales, 397 U.S. 1035, 90 S.Ct. 1365, 25 L.Ed.2d 646 (1970). That case was ultimately decided under the name of Richardson v. Perales, 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). Our attention was not called to the Supreme Court's decision of the *Perales* case on the merits and we did not learn that the Supreme Court had decided that case until it came to our attention in connection with another matter.

Principles articulated in Richardson v. Perales do not affect the determination of this case. That case dealt with the question of whether physicians' written reports may constitute substantial evidence when the claimant objects to the admissibility of those reports. The reports involved in that case were detailed and in other than bald conclusory language. *Perales* simply concluded that a written report by a licensed physician who has examined the claimant may be received in evidence despite its hearsay character and may constitute substantial evidence should the claimant fail to subpoena the reporting physician. That case does not hold that all reports, regardless of their content, are to be considered substantial evidence.

The principles and standards stated in Budds v. Richardson (W.D.Mo.1970) 313 F.Supp. 1048, and the cases cited in the second paragraph of our opinion in that case are applicable and will be applied to the factual circumstances of this case. As will be noted, the facts of this case are strikingly similar to those presented in *Budds*.

In this case, the hearing examiner's decision was based on substantially the same stereotyped language as that used by the hearing examiner in *Budds* to support his denial of that widow's disability claim. See page 1050 of 313 F. Supp. The hearing examiner in this case stated:

In this connection, it is noted that the medical evidence of record includes a medical judgment by a physi-

cian designated by the Secretary that the claimant's impairments are not medically the equivalent of the impairments listed in said Appendix [Exhibit 10].[1]

In this case, as in *Budds*, the exhibit to which the hearing examiner made reference was to a form entitled "Disability Determination and Transmittal." In both cases the first page of that form contained the illegible signatures scrawled in box 34 designated "Disability Examiner SA" and in box 36 which carries a caption "Review Physician SA." The initials "M.D." are legible in box 36. Those initials do not appear in box 34.

The second page of the form, entitled "Continuation Sheet for Disability Determination" did not in either case indicate who may have actually written what appears on that page of the form. In *Budds* we expressed our real concern as to whether the doctors who scrawled their names on page one of the form actually wrote what appears on the attached continuation sheets. In *Budds* we stated:

> The continuation sheets are written in legal, rather than medical, language. Indeed, if the unidentified doctors (their respective signatures are illegible) did, in fact, write the continuation sheets, they would have done so in apparent violation of 20 C. F.R. § 404.1526 which explicitly states that "the function of deciding whether or not an individual is under a disability is the responsibility of the Secretary."

We are also concerned about the inaccurate and erroneous statements contained on the two continuation sheets, regardless of who may have written them, because such administrative work indicates a lack of concern that the rights of claimants be fairly determined on the basis of the actual factual circumstances presentted. [313 F.Supp. at 1051].

We entertain the same concern in this case. There are additional difficulties with the continuation sheet before us in this case. That sheet states that "the evidence upon which the prior determination was based is hereby incorporated by reference." The transcript, however, does not contain any "prior determination" nor does it contain any "evidence" upon which the unidentified doctors (we assume both the unidentified persons involved in this case were in fact doctors) purportedly based their judgment. The continuation sheet further states that "This revises but affirms the determination of 7/10/69." The transcript does not contain any determination made on July 10, 1969. It shows only (Tr. 58) that the claimant was written a letter on July 23, 1969, in which she was advised that "after carefully studying the medical evidence in your case and your statements, it has been determined that your condition is not severe enough to meet the disability requirement of the law."

The transcript does not show what "medical evidence" was "carefully" studied. Nor does it show the criteria applied in making the determination of the severity of the claimant's disability. The most that can be assumed is that some unidentified person or persons may have reviewed Dr. Strauss' medical report which was received by the Kansas City office on June 16, 1969 (see Tr. 78). Dr. Strauss, a Board certified specialist, stated that the claimant had been under his care since 1965 for numerous difficulties, some ten in number, including, but not limited to iron deficiency anemia due to menorrhagia. The government concedes in its brief that this condition consists of "abnormally profuse menstruation."

1. In its suggestions in opposition to plaintiff's motion for summary judgment the government argues in similar fashion that "In this case the physician employed by the Missouri State agency (Tr. 72–73) found that the plaintiff's impairments were not medically equivalent to any impairment listed in the regulations." The citation to pages 72–73 of the transcript is a citation to Exhibit 10 cited by the hearing examiner to support his "finding." Exhibit 10, which appears on pages 72–73 of the transcript, will be discussed in detail in the text.

The continuation sheet which is a part of Exhibit 10 did not mention this condition or any of the other nine items stated by Dr. Strauss. It simply stated in conclusory language that "the review team concludes that the medical evidence was properly evaluated at the time [of] the prior determination to show that this widow is not under an impairment or impairments, taken either singly or in combination, which is of such severity as to meet or closely approximate the medical listings and therefore we feel that the application for DWB should again be denied." The transcript does not show (and we do not know) who may have constituted "the review team."

An Addendum was added at the bottom of the continuation sheet which stated that "medical evidence received 11/19/69, after the above determination made, does not materially affect this determination."

The most that can be assumed from the addendum is that the unidentified doctors reviewed the first of four reports submitted by Dr. J. P. Farney, a Board certified specialist in obstetrics and gynecology. That first report was dated November 17, 1969 and could have been received before the continuation sheet was written on November 19, 1969. Dr. Farney's first report stated that the claimant had been first treated for menorrhagia in 1964 and that she "still has problems with this bleeding off and on since that time." That report pointed out that the claimant would have to be admitted to the hospital for possible hysterectomy should the hormone therapy which she was currently receiving not help. It also stated the necessity for his treatment of plaintiff for anemia resulted from "this heavy and prolonged bleeding." [2]

Dr. Farney submitted additional reports on January 13, 1970 (which stated "I am seriously considering a possible hysterectomy for this patient to stop her bleeding"); on April 20, 1970 (which stated that "an abdominal hysterectomy [would be performed] as soon as we can get her blood count high enough" and that should claimant again "begin to

---

2. The government concedes that the claimant testified that "she was unable to work because she could not stand on her feet 8 hours a day due to the hemorrhaging. She also feels tired and worn out all the time and does not have complete use of her right hand (Tr. 43, 49–50)." Plaintiff's testimony in regard to the extent of the bleeding is illustrated by the following testimony at other places in the record not cited by the government:
Q. When you started bleeding, did you go to the hospital right away?
A. I went to the hospital twice. I was hospitalized twice.
Q. How long were you in the hospital? What did they tell you in the hospital?
A. They just put me flat on my back, and every time I would get up I would start hemorrhaging again, and I would have to stay there. My blood count was 52, and in order to keep me there, they kept giving me blood transfusions. The doctor said he would give me medication if I would promise I would go home and get in bed and stay in bed for 9 months and do nothing but stay in bed, eat and take this medication.
Q. What doctor told you this?
A. Dr. Farney. [Tr. 39–40]

* * * * *
Q. And this is vaginal bleeding, is that correct?
A. It can start any time. Week before last we had a pick-up on our trash, and I forgot to ask my son to put the trash out the night before, and I had to get up and take it out the next day, and I took it out and set it on the curb and right away I started bleeding again. If I pick up anything, I am not even allowed to pick him up. The doctor told me not to ever pick him up off the floor (she is referring to grandson who attended the hearing with her). I start, and I never know when I am going to start. If I am on my feet too much, I will start.
Q. How frequently is this bleeding?
A. It can be every week. It doesn't have a certain time.
Q. More than once a week?
A. Oh, yes.
Q. How many times a week do you bleed on an average?
A. Sometimes three or four days before I stop, and that means that I have got to double up on my medication before I stop, and if I don't, if that doesn't

hemorrhage, then she will be admitted to the hospital as an emergency"); and on October 10, 1970 (which advised that the "hysterectomy had been performed" and that "patient lost a considerable amount of weight and she will require at least one year to recuperate from the surgery").

It is quite clear that none of Dr. Farney's reports were given appropriate consideration; indeed, there is nothing in the record to show that the unidentified doctors ever even saw his last three reports. Dr. Farney's reports and the medical records which he forwarded corroborated claimant's testimony as to her weight loss, the debilitating effect of her anemia, and the loss of blood which resulted from her progressive condition of menorrhagia.

The hearing examiner's decision makes but passing reference to Dr. Farney's January 13, 1970 report. It finds as a "fact" that Dr. Farney was "seriously considering hysterectomy as a solution . . . [to claimant's] anemia." Dr. Farney's other reports which established that the operation was actually performed, were forwarded to the Appeals Council which consistently stated, without explanation or reason, that the additional reports provided no basis for it to change its decision.

In this case, as in *Budds,* the hearing examiner does not make any findings under the statute; he merely examines the listings in the regulation. In spite of the fact that Dr. Farney stated that claimant's surgery was severe enough to require at least one year to recuperate, the hearing examiner makes a "finding" that "claimant's most serious condition, the condition of menorrhagia, is remedial by surgery, i. e., hysterectomy." This case reflects the same lack of administrative concern for the rights of claimants to have their cases fairly determined on the basis of the actual circumstances presented and in accordance with the command of the statutes passed by the Congress, as distinguished from regulations which might be said to narrow the Congressional command, as was reflected by similar administrative processing in *Budds* and the cases therein cited.

We find and conclude for generally the same reasons stated in *Budds* that there is no substantial evidence for the conclusion that plaintiff is not disabled. We further find and conclude that there is an absence of substantial evidence to support a finding that plaintiff's impairments are not the equivalent of those listed in the regulation. We assume for purposes of this decision that the regulation is not so distinctly contrary to the statute as to require an adjudication of unconstitutionality.

stop it then I have to go and get the shot. It helps me to stop.
Q. Have you lost weight?
A. Well, I was weighing 135, and I am down to 110.
Q. When did you last weigh 135?
A. I think about '68.
Q. About 1968? Right now you are at 110?
A. Yes, and I got down to 101.
Q. Is it not true also that you are being treated for anemia?
A. Oh, yes.
Q. Are you taking pills for anemia?

A. All of the time. If I ever missed, I would probably have to take blood transfusions.
Q. This is caused by your bleeding?
A. That is what the doctor said, yes. [Tr. 48-49].

Plaintiff's testimony of hospitalization is corroborated by medical records from the Menorah Medical Center which also reflect "progressive menorrhagia past three years" (three day confinement 7-8-64 to 7-11-64) and "menorrhagia" (four day confinement 4-15-65 to 4-19-65).